UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MIREILLE SITA-MAMBWENE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV00913 ERW |
| | ) | |
| ANTHONY EUGIN KEETON, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Petitioner Mireille Sita-Mambwene's Verified

Petition for Return of Children under the Hague Convention [doc. #1].

On June 11, 2009, Petitioner Mireille Sita-Mambwene ("Petitioner") filed the pending

Petition with this Court. Petitioner alleges that Respondent Anthony Eugin Keeton

("Respondent") wrongfully removed their three minor children[1] from Germany, which she asserts

is their place of habitual residence, in March 2008. Thus, Petitioner seeks relief from this Court

under the Hague Convention. Specifically, Petitioner seeks an Order from this Court, requiring

the return of the children to Germany and to Petitioner. Respondent opposes Petitioner's

requested relief, and asserts various affirmative defenses in support of his arguments.

## I.   WRONGFUL REMOVAL UNDER THE HAGUE CONVENTION

In 1980, a group of countries participated in and adopted the Hague Convention on the

Civil Aspects of International Child Abduction ("the Convention"). Although the United States

did not participate in the actual proceedings, it ratified the Convention in 1988, by enacting the

---

[1]Petitioner and Respondent have three children together, P.K. (age 10), S.K. (age 9), and
J.K. (age 7).

International Child Abduction Remedies Act ("ICARA").  42 U.S.C. § 11601-11611 (1988).  The

stated purpose of the Convention was "to secure the prompt return of children wrongfully

removed to or retained in any Contracting State; and to ensure that rights of custody and of

access under the law of one Contracting State are effectively respected in the other Contracting

States."  Hague Convention on the Civil Aspects of International Child Abduction art. 1, Oct. 25,

1990, 19 I.L.M. 1501.  In carrying out this stated purpose, the Convention provides for the return

of a child who has been "wrongfully removed" from the country in which he or she is a habitual

resident.  *Id.* arts. 3, 12.  The removal of a child is considered to be "wrongful" when it is in

breach of the custody rights of another person and when those custodial rights were actually being

exercised at the time of the removal, or would have been exercised but for the removal.  Custodial

rights, and any breach thereof, are determined under the law of the country that is determined to

be the child's habitual residence.[2]  *Id.* art. 3.

As noted by the Eighth Circuit, "[t]he key inquiry under the Convention is whether a child

has been wrongfully removed from the country of its habitual residence or wrongfully retained in

a country other than that of its habitual residence."  *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th

Cir. 2008).  In determining whether a child was wrongfully removed under the Convention, a

---

[2]The Convention distinguishes between "rights of custody" and "rights of access."  The former refers to the "rights relating to the care of the person of the child," and specifically requires the person asserting custody to possess "the right to determine the child's place of residence."  The latter, however, refers to "the right to take the child for a limited period of time to a place other than the child's habitual residence."  *Id.* art. 5.  Rights of custody are assigned greater protection under the Convention than are rights of access; the Convention provides for the return of the child to his or her habitual residence in cases involving rights of custody, but in cases involving rights of access, the Convention only requires a country to take "steps to remove, as far as possible, all obstacles to the exercise of such rights."  *Id.* arts. 12, 21; *see Gonzalez v. Gutierrez*, 311 F.3d 942, 948-49 (9th Cir. 2002).

court is to address a series of four questions, initially set forth by the Ninth Circuit and subsequently adopted by many other courts, including the Eighth Circuit. These questions are:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *see also Barzilay*, 536 F.3d at 847. The Court will address these issues in the sections that follow.

Finally, it is important to note that "[a] case arising from a petition under the Hague Convention is not a custody proceeding. A United States district court 'has authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.'" *Barzilay*, 536 F.3d at 847 (quoting *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999)).

### A.  TIME OF REMOVAL

The issue of when the alleged wrongful removal took place is not disputed in this case. It is clear that the removal at issue occurred on or about March 1, 2008, when Respondent left Germany with the three minor children and came to the United States.

### B.  PLACE OF HABITUAL RESIDENCE

The Court must now determine where the children were habitually residing immediately prior to the alleged wrongful removal. Although the Convention places great significance on the place of the child's habitual residence, it does not provide a precise definition or explanation of what is meant by the term. *See Mozes*, 239 F.3d at 1071. The Convention does, however, establish that the only relevant point in time for determining habitual residence is "immediately before the removal or retention." *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (en

3

banc) (citing Hague Convention on the Civil Aspects of International Child Abduction art. 3, Oct. 25, 1990, 19 I.L.M. 1501). Beyond the minimal guidance provided by the Convention, the Eighth Circuit has recognized that

> "[a] person may have only one habitual residence and it should not be confused with domicile. [T]he court must focus on the child, not the parents, and examine past experience, not future intentions. Habitual residence may only be altered by a change in geography and passage of time."

> "Federal courts are agreed that habitual residence must encompass some form of settled purpose. The settled purpose need not be to stay in a new location forever, but the family must have a sufficient degree of continuity to be properly described as settled."

*Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009) (quoting *Silverman*, 338 F.3d at 898) (alterations in original and citations omitted).

The Court finds that the three minor children are habitual residents of Germany. Immediately before the alleged wrongful removal of the children on or about March 1, 2008, none of the three children had known a home other than Germany. The children were born in Germany, went to school in Germany, and were involved in numerous activities in Germany. The evidence suggests that the children never left Germany, except when Respondent took the children to the United States in March 2008. All of the experiences of the children (prior to their removal to the United States in March 2008) took place in Germany. Prior to March 2008, it is clear that the children, and the whole family, were settled in Germany to such a degree that it can be considered their habitual residence.

Respondent argues that the Parties had always planned to relocate to the United States, and that such a plan was in place when he took the children in March 2008. This Court disagrees, and finds that there was no existing plan for relocation to the United States. While the Parties

may have inferentially discussed a move to the United States, the following evidence suggests that there was never a real intention to go. First, Respondent traveled to the United States from Germany from time to time, but he always eventually returned to Germany. Second, it is undisputed that Respondent severely beat Petitioner on or about April 30, 2007.[3] The Court finds to be credible Petitioner's testimony that she was afraid of Respondent and didn't want to go to the United States, because she had no friends or family there and no means of protection. Regardless, any plans to move to the United States are mere future intentions, not to be considered in determining habitual residence. Thus, Respondent's suggestion that the Parties intended to move to the United States does not affect this Court's determination that Germany is the habitual residence of the three minor children.

## C.   CUSTODIAL RIGHTS ISSUES

Finally, the Court must consider whether the alleged wrongful removal was in violation of Petitioner's custodial rights under German law, and, if so, whether Petitioner was actually exercising those rights at the time of the alleged wrongful removal. The uncontroverted evidence shows that Petitioner and Respondent were married at the time of the alleged wrongful removal and that they exercised joint physical and legal custody of the children. (Pet.'s Petition, doc. #1, ¶¶ 3.1, 3.6, 4.1) (Resp.'s Amended Answer, doc. #31, ¶¶ 3.1, 3.6, 4.1). Additionally, it is undisputed that Section 1626 of the German Civil Code dictates that married parents share custody of their children and have the same rights and duties regarding care for their children. (Pet.'s Petition, doc. #1, ¶ 3.4) (Resp.'s Amended Answer, doc. #31, ¶¶ 3.4, 4.1). From this

---

[3]Petitioner also testified that Respondent beat her a few times prior to the April 2007 incident. This testimony was not refuted by Respondent.

evidence alone, it is clear that Petitioner had custodial rights at the time of the alleged wrongful removal. Additionally, it appears that Petitioner was actually exercising those rights when Respondent took the children to the United States. The evidence suggests that Petitioner and Respondent were living together in a house with the children at the relevant time and that Petitioner was participating in the parenting of the children.

Thus, the remaining issue is whether Respondent's actions were in breach of Petitioner's custodial rights. The Court finds that they were. The credible evidence is that Respondent planned to abduct the children by telling Petitioner that he was taking them to an amusement park. Respondent and the children never actually went to the amusement park; instead, they boarded an airplane and flew to the United States. Respondent then lied to Petitioner during several telephone calls that she placed to him, trying to get an explanation as to why Respondent and the children had not returned as earlier represented to her. Upon discovering that the children were in the United States with Respondent, Petitioner immediately sought police involvement and timely sought relief under the Hague Convention. Respondent's act of deception and his subsequent removal of the children to the United States deprived Petitioner of the ability to see her children and interact with them. Thus, the Court finds that Respondent's actions breached Petitioner's custodial rights and constituted a wrongful removal under the Hague Convention.

Having concluded that the three minor children were habitual residents of Germany and that they were wrongfully removed from that habitual residence, the Court finds that Petitioner has met her burden with respect to her Hague Petition. Unless Defendant can establish one of the affirmative defenses set forth in the Hague Convention, this Court is required to order the return of the children to Germany.

## II.   AFFIRMATIVE DEFENSES

The Hague Convention establishes several affirmative defenses that may be advanced in opposition to a Hague petition.[4]   First, a court may not be required to return a child to his or her habitual residence if the Convention proceedings are not brought within one year of the date of the wrongful removal and the child has settled into his or her new environment (hereinafter, "the well-settled defense").   Hague Convention on the Civil Aspects of International Child Abduction art. 12, Oct. 25, 1990, 19 I.L.M. 1501.   Additionally, a court is not required to return a child if the person now asserting custodial rights "had consented to or subsequently acquiesced in the removal or retention" (hereinafter, "the consent/acquiescence defense").   *Id.* art. 13.   Another exception exists when "there is a grave risk that [a child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" (hereinafter, "the grave risk defense").   *Id.*   The return of a child may also be avoided if the child objects to the return and is of sufficient age and maturity to make such a decision (hereinafter, "the mature child defense").   *Id.*   Finally, a court may refuse to return a child when it would be contrary to the country's "fundamental principles" with respect to freedom and human rights.   *Id.* art. 20.   The Eighth Circuit has established that "a court applying the Hague Convention should construe these exceptions narrowly."   *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

### A.   WELL-SETTLED DEFENSE

The well-settled defense is established in Article 12 of the Hague Convention, which provides:

---

[4]These affirmative defenses were adopted by ICARA and are thus valid law in the United States.   *See* 42 U.S.C. § 11603(e)(2).

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention on the Civil Aspects of International Child Abduction art. 12, Oct. 25, 1990, 19 I.L.M. 1501.

In this case, the wrongful removal occurred on or about March 1, 2008, while the Hague Convention proceedings in this Court were commenced on June 11, 2009. Because the Petition was filed more than one year after the wrongful removal of the children, it initially appears that the well settled defense could apply. However, various courts have held that "equitable tolling may apply to ICARA [or Hague Convention] petitions for the return of a child where the parent removing the child has secreted the child from the parent seeking return." *Furnes v. Reeves*, 362 F.3d 702, 723 (11th Cir. 2004); *see also Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008); *Muhlenkamp v. Blizzard*, 521 F. Supp. 2d 1140, 1151-52 (E.D. Wash. 2007); *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 848-49 (S.D. Tex. 2006); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1281 (N.D. Ga. 2004). This Court agrees that equitable tolling should apply when a child's whereabouts are concealed because "courts must be wary of rewarding an abductor for concealing the whereabouts of a child long enough for the child to become 'well-settled'; to reward the abductor as such would be to condone the exact behavior the Convention seeks to prevent." *Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003).

With respect to this case, the Court finds that the one year period should be equitably

tolled because Respondent intentionally concealed the location of the three minor children. After

the initial move to the United States, Respondent moved to three different addresses. Although

he kept Petitioner apprised of his first three addresses, the moves were frequent enough that the

U.S. State Department had difficulty locating him. (Pet.'s Ex. M). Taking Respondent's view of

the reasons for the frequent moves as true, Petitioner always dutifully sought out the address at

which her children were living and turned that address over to the proper authorities. Eventually,

in November 2008, Respondent refused to give Petitioner the address at which he was living with

the children. Instead, he required her to send all correspondence to a post office box. Moreover,

the emails that were presented to the Court as Petitioner's Exhibits T-W demonstrate that

Respondent did not want Petitioner involved in their lives. Specifically, the emails demonstrate

that Respondent limited the number and length of telephone calls between Petitioner and the

children (Pet.'s Ex. W; Pet.'s Ex. U) and that he called her vile names and used offensive

language to insult her.[5]

For approximately five months, Petitioner was unable to ascertain the address for her

children. Ultimately, in late March 2009, Petitioner was finally able to obtain the address, after

explaining that she wanted to send a large package containing a toy airplane to her son. Because

the package would not fit into the post office box, Respondent provided their home address.

---

[5]In an email dated April 21, 2009, Respondent stated that "[t]hese children don't have any idea of the rubbish you are" and that "[l]ife with you is punishment." Respondent also told Petitioner that he hated her and that he "never want[ed] to see [her] black African butt again in [his] life." (Pet.'s Ex. T). In an email dated May 11, 2009, Respondent referred to Petitioner as a "bag of shit." (Pet.'s Ex. U). In an email dated May 12, 2009, Respondent called Petitioner "the best friend of Satan." (Pet.'s Ex. V). In another email dated May 11, 2009, Respondent called Petitioner "an idle whore." (Pet.'s Ex. W).

Petitioner then promptly turned this address over to the proper authorities and initiated this action. The Court finds that for at least the five months that Respondent refused to divulge the children's address, the one year period should be equitably tolled. With only these five months tolled, the Court can find that Petitioner's action was commenced within one year of the wrongful removal. The Court need not reach the issue of whether the children's whereabouts were sufficiently concealed at the first three disclosed addresses for the purpose of equitable tolling.

The well-settled defense is inapplicable in this case solely based on the Court's finding that equitable tolling applies such that Petitioner commenced this action within the one year period. However, even if this Court did not find that the one year period should be equitably tolled, the well-settled defense would still fail because the evidence suggests that the children are not well-settled, rather, they have moved several times and have attended several different schools.[6] Thus, Respondent's assertion of the well-settled defense is rejected.

## B. CONSENT/ACQUIESCENCE DEFENSE

The consent/acquiescence defense is established in Article 13 of the Hague Convention, which provides:

> the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that the person, institution or other body having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention.

---

[6]Notwithstanding the Court's finding that the children are not well-settled, the evidence is remarkable as to the appropriate care that Respondent provided to the children while they were in his custody. The credible evidence from Michele Goodrum, a teacher who knows the children and who taught J.K., was that the children were "clean," "healthy," and "happy." Additionally, Ms. Goodrum testified that Respondent was very involved and sought out additional resources to assist his son with his learning difficulties. The Court commends Respondent for the quality of care he provided to his children.

Hague Convention on the Civil Aspects of International Child Abduction art. 13(a) , Oct. 25, 1990, 19 I.L.M. 1501.

The Court finds that the consent/acquiescence defense does not apply in this case. There is no evidence that Petitioner ever consented to the move. To the contrary, the evidence demonstrated that she did not know that Respondent was taking the children to the United States and, once she discovered that they were there, she did everything that she could to try to get them back. Additionally, there is no evidence that Petitioner acquiesced to the move. Again, Petitioner did everything that she could to try to get her children back. She immediately sought police involvement after the children were removed and she timely sought relief under the Hague Convention. She also attempted to negotiate informally with Respondent in an attempt to resolve their differences. Further, Petitioner sent Respondent money for a visa and she truthfully testified that it was her intention to use the visa to take the children back to Germany. However, Respondent failed to obtain the visa for Petitioner and failed to return her money to her. Thus, the Court finds no evidence that Petitioner consented or acquiesced to the taking of her children to the United States. Respondent's consent/acquiescence defense must fail.

## C.     GRAVE RISK DEFENSE

The grave risk defense is also established in Article 13 of the Hague Convention, which provides:

> the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention on the Civil Aspects of International Child Abduction art. 13(b), Oct. 25, 1990, 19 I.L.M. 1501.  It is clear that "only severe potential harm to the child will trigger this Article 13b exception."  *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995); *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (stating that the "context makes it clear that the harm must be a great deal more than minimal").  The Second Circuit established the following spectrum for use in determining if there is a grave risk of harm:

> [A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.  The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001).  The Sixth Circuit has stated that there are only two situations in which a grave risk of harm exists for the purpose of the Hague Convention: 1) "when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute- *e.g.,* returning the child to a zone of war, famine, or disease," and 2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."  *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

Considering the level of potential harm that has been required by courts applying the Hague Convention, this Court finds that the risk of harm alleged by Respondent does not rise to the level required by law.  The majority of Respondent's argument regarding the grave risk defense deals with the "endemic racism" that he alleges the children are subject to in Germany. (Resp.'s Brief in Support of Amended Answer, doc. #45, p.6).  While this Court recognizes that

racism is a serious social problem throughout the world, it does not meet the standards outlined above. Moreover, it is unclear that the racism that apparently exists in Germany is more pervasive or problematic than the racism that unfortunately continues to plague the United States.

Respondent also argues that the children will suffer psychological harm if they are returned to Germany, due to "the trauma of being separated from the Respondent, their primary caregiver." (Resp.'s Brief in Support of Amended Answer, doc. #45, p.6). Numerous courts have rejected similar arguments, finding that it would circumvent the purpose of the Hague Convention. *See Friedrich*, 78 F.3d at 1068 ("A removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return."); *Walsh v. Walsh*, 221 F.3d 204, 220 n.14 (1st Cir. 2000) ("We disregard the arguments that grave risk of harm may be established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal."). This Court likewise rejects this argument.

Finally, to the extent Respondent asserts that the children's academic and social progress should prevent their removal, the Court cites the above quoted portion of *Blondin v. Dubois*, and rejects his argument. *See Blondin*, 238 F.3d at 162 (identifying "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences" as being on the end of the spectrum that "do[es] not constitute a grave risk of harm under Article 13(b)"). Thus, the Court finds that the grave risk defense does not apply in this case to prevent the return of the three minor children to their habitual residence.

**D.     MATURE CHILD DEFENSE**

Respondent did not specifically plead the mature child defense.[7] Even if the Respondent

had included this affirmative defense in his Amended Answer, there is no evidence before the

Court to support the defense. On the Court's own motion, a guardian ad litem was appointed to

represent the three minor children. Before beginning the trial in this case on August 26, 2009,

Mr. Thomas M. Lang, the appointed guardian ad litem, met with the children. Mr. Lang stated to

the Court that the children would not be testifying in the case. He said that it is obvious that the

children love both parents and that both parents love the children. It was agreed by the Parties

that the children would not testify. The Court adopted Mr. Lang's opinion and the children were

not called to the witness stand. To the extent that Respondent asserts the mature child affirmative

defense, it is denied.

**III.     CONCLUSION**

The Court finds that Petitioner has established that the habitual residence of the three

minor children is Germany and that they were wrongfully removed from that habitual residence by

Respondent. The Court also finds that none of the affirmative defenses set forth in the Hague

Convention are applicable. Thus, the Court will grant Petitioner's Hague Petition. The Court

reminds the Parties that this Order is not a determination of the merits of any custody issues.

Such issues should be directed to an appropriate court in Germany.

---

[7]The mature child defense is established in Article 13 of the Hague Convention, which
provides: "The judicial or administrative authority may also refuse to order the return of the child
if it finds that the child objects to being returned and has attained an age and degree of maturity at
which it is appropriate to take account of its views." Hague Convention on the Civil Aspects of
International Child Abduction art. 13, Oct. 25, 1990, 19 I.L.M. 1501.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Verified Petition for Return of Children under the Hague Convention [doc. #1] is **GRANTED**. The three minor children, P.K., S.K., and J.K., shall be returned to Germany, their place of habitual residence.

**IT IS FURTHER ORDERED** that on **Saturday, August 29, 2009**, at **2:00 p.m.**, the three minor children shall be delivered to the law firm of Petitioner's counsel: Bryan Cave LLP, 211 N. Broadway, Suite 3600, St. Louis, Missouri 63102. Counsel for Petitioner shall make appropriate arrangements to ensure that the building is available and accessible.

**IT IS FURTHER ORDERED** that no award of counsel fees, costs, or transportation costs will be made at this time. Upon motion properly made, the Court will consider the matter separately.

**IT IS FURTHER ORDERED** that all remaining pending motions in this case are **DENIED, as moot**.

Dated this 28th Day of August, 2009.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE